## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 3:21-cr-108** |
| **Plaintiff,** | : | |
| v. | : | |
| **JASON POLLET** | | **SENTENCING MEMORANDUM** |
| | : | **OF DEFENDANT UNDER SEAL** |
| **Defendant.** | | |

Now comes the Defendant, Jason Pollet, by and through Counsel, and provides the following sentencing memorandum:

1. **Case History**

On November 9, 2021, Mr. Pollet plead guilty by way of Bill of Information to a single count of Distribution of a Visual Depiction of Material Involving the Sexual Exploitation of Minors in volition of 18 U.S.C. 2252(a)(2) and 2252(b)(1). Mr. Pollet failed to appear at his October 19, 2021, hearing due to a failed suicide attempt. Mr. Pollet was taken by squad to Miami Valley hospital and was later released to the custody of the US Marshalls. Mr. Pollet has remained incarcerated since that time.

2. **Potential Statutory Penalties**

The statutory penalties for this offense include a mandatory minimum term of imprisonment of five years and a maximum term of 20 years as well as a period of supervised release of no less than five years up to lifetime. Further, Mr. Pollet must register as a sex offender and is subject to a maximum fine of $250,000, a $100 special assessment, and restitution.

**3. Agreed Guideline Range**

Mr. Pollet's plea was made pursuant to a plea agreement between the United States of America and Defendant. The parties agreed to a sentencing disposition no greater than 151 months, a term of supervised release, fine to be determined by the Court, forfeiture, a $100 mandatory special assessment, and restitution to be determined by the Court.

The parties agreed to certain guideline factors, while reserving the right to argue for other adjustments and departures which may be appropriate, as follows:

| Base Level Offense | 22 | USSG §2G2.2 |
|---|---|---|
| Prepubescent Minor | 2 | USSG §2G2.2(b)(2) |
| Distribution | 2 | USSG §2G2.2(B0(3)(f) |
| Infant or Toddler | 4 | USSG§2G2.2(b)(4) |
| Use of a Computer | 2 | USSG§2G2.2(b)(6) |
| More than 600 images | 5 | USSG§2G2.2(b)(7) |
| Acceptance of Responsibility/Timely Notification | -3 | §§3E1.1(a)&(b) |
| **Net Guideline range (151-188 months)** | **34** | |

The Presentence Investigation Report determined Defendant's advisory guideline range based on a calculated adjusted offense level of 34, with a criminal history category I. That advisory sentencing range, absent the plea agreement, would be 151 to 188 months.

**4. Legal Standards and Sentencing Guidelines**

Pursuant to relevant sections of 18 U.S.C. §3553(a)(2), a sentence must consider the seriousness of the offense, provide just punishment, promote respect for the law, afford adequate

2

deterrence, protect the public, and to ensure the effective educational, vocational, medical care, or other correctional treatment in the most effective manner. Additionally, a sentence must take into consideration the nature and circumstances of the offense and the history and characteristics of the offender. 18 U.S.C. 118 U.S.C. §3553(a)(1).

In *United States v. Booker*, the Supreme Court found that a mandatory guidelines sentence violates the Sixth Amendment. 543 U.S. 220, 226 (2005). As such, the Sentencing Guidelines are treated as a factor in sentencing along with the sentencing factors named in §3553(a).

The Guidelines, which *Booker* directs sentencing judges to consult, along with the statutory goals of sentencing, explicitly require that plea-bargained sentences straying from the Guidelines rest upon "justifiable reasons." *United States v. Coney, 390 F. Supp.2d 844, 849 (D. Neb. 2005)* ("The Advisory Guidelines Impose a Duty Upon the Judge to Assure that a Rule 11(c)(1)(C) Plea Agreement Requiring a Sentence or Sentencing Range Outside the Guidelines Is Premised Upon a 'Justifiable Reason.'"). Specifically, *U.S.S.G. § 6B1.2(c)*, relating to standards for the acceptance of plea agreements, provides the following rule for *Rule 11(c)(1)(C)* plea agreements:

> (c) In the case of a plea agreement that includes a specific sentence (Rule 11(c)(1)(C)), the court may accept the agreement if the court is satisfied that either:
>
> (1) the agreed sentence is within the applicable guideline range; or
>
> (2) (A) the agreed sentence departs from the applicable guideline range for justifiable reasons.

The commentary to this section explains that "justifiable reasons" mean Guidelines-based reasons. *U.S.S.G. § 6B1.2*. While this commentary limits "justifiable reasons" to reasons found within the Guidelines, the effect of *Booker* is to expand the range of "justifiable reasons" to include those reasons that are consistent with the statutory goals of sentencing even though those reasons might not be recognized by the Guidelines.

Thus, post-*Booker*, "justifiable reasons" for accepting a stipulated sentence or range above or below the Guidelines can be split into two categories. They are (1) reasons found within the Guidelines and thus consistent with them, and (2) reasons found outside the Guidelines that are consistent with the statutory goals of sentencing and do not undermine the Guidelines. There may be circumstances that warrant a sentence different from that required by application of the advisory Guidelines and those reasons may not be based upon any particular provision of the Guidelines.

The dissent in *United States v. Walters*, points out concerns with the guidelines in cases such as this.

> Many of the groups of officials and experts who have looked into the problem of Internet child porn have reached the conclusion that the sentencing guidelines that the District Court and our Court have now enforced in this case should be greatly reduced. Most importantly, these groups include the Sentencing Commission itself, which has conducted an extensive study and then issued a 350 page Report in 2012 entitled "Federal Child Pornography Offenses" [available at: http://www.ussc.gov/news/congressional-testimony-and-reports/sex-offense-topics/report-congress-federal-child-pornography-offenses]. The Report asks Congress to remove the harsh Protect Act provisions that ordered the Sentencing Commission in 2003 to write guidelines recommending to judges the imposition of sentences such as the 12-plus year sentence in this case. The report is based in part on the refusal of a sizeable majority of judges to follow the guidelines and the opinion of experts in the field, including psychologists, medical experts and legal scholars who have studied the problem. The Commission's study arrived at the conclusion that the present child porn guidelines have "no rational basis," are "outmoded," do not "distinguish adequately among offenders based on their degrees of culpability," and have "enhancements," like the ones in this case, that are "outmoded and disproportionate." The disagreement with the guidelines for nonproduction offenders is widespread. The Report at page xxi concludes in part: Numerous stakeholders—including the Department of Justice, the Federal Defender community, and the Criminal Law Committee of the Judicial Conference of the United States—have urged the Commission and Congress to revise the nonproduction sentencing scheme to better reflect the growing body of knowledge about offense and offender characteristics and to better account for offenders' varying degrees of culpability and dangerousness.

*United States v. Walters,* 775 F.3d 778, 788-89 (6th Cir. 2015).

4

5. **Nature and Circumstances of the Offense**

During the commission of this offense, Mr. Pollet found himself alone, going through an emotional divorce that was, in his perspective, out of the blue. It was at this time that Mr. Pollet reengaged on "Fetlife," seeking comfort and support. Mr. Pollet and his wife had previously been on "Fetlife" to explore their shared sexual fetishes.

Mr. Pollet started engaging in conversation with someone whom he thought was an attractive, adult woman. Unbeknownst to him, the user was an undercover Agent (UCO). The two connected over similar interests, engaged in conversation, and sent each other pictures of themselves. Mr. Pollet was desperate for attention. Mr. Pollet described his fantasies and made a reference to "young broken girls." UCO responded "Getting more interesting. How young were these slutty whores you used??" In the Matter of the Search of the Person of Jason W. Pollet, Affidavit at ¶32(c) (Case No. 3:21-MJ-108, ECF No 1 (March 22, 2021). Mr. Pollet continues to send images/videos to UCO who in turn praises him for sending them. UCO "Something about it being illegal gets me going." UCO "it's making me wet." UCO "you get an A+ for finding this." (*id.* at ¶33(b)) UCO asked Mr. Pollet how comfortable he was around children and stated, "Ok more questions…but don't judge me promise." (*id.* at ¶33(c)(e). Mr. Pollet continued to send UCO videos/pictures and UCO continued to encourage him.

The conversations between Mr. Pollet and UCO spanned from October 2020 until March 2021 when law enforcement served the warrant.

6. **Protect the Public from Further Crimes of the defendant**

Protecting innocent children rightfully a concern in child pornography cases. Perpetuating the pornography industry undoubtedly harms the public and places children at risk of sexual abuse. However, there is no indication that Mr. Pollet is a threat to society as a whole. He engaged in

5

conversation on a niche website and sought out an adult woman. There is no indication that he has engaged in any sexual misconduct with children or engaged in exchanging child pornography with anyone else. The Government cites to messages Mr. Pollet sent to UCO stating that he wanted to engage in sexual acts with the UCO's children. These messages are vile and inexcusable. However, the context of these messages is critical. Mr. Pollet believed he was in "fantasy land" and although engaging in such a fantasy is inappropriate, there is no indication that Mr. Pollet was going to act on those words. In fact, Mr. Pollet told UCO that he knew some of the victims in the videos but in reality, he did not. Further, Mr. Pollet was pulling from his own sexual abuse as a frame of reference to play out a fantasy that he thought UCO wanted to be a part of. Mr. Pollet does not have children and neither did either of his wives. There is no indication that he engaged in sexual activity/conduct with a child or surrounded himself by children. Mr. Pollet asks the Court to consider his statements through the lens of the world Mr. Pollet was emersed in.

7. **Deterrence and Respect for the Law**

The Court must tailor a sentence to ensure deterrence and respect for the law. The Government draws attention to the fact that Mr. Pollet understood the seriousness of his offense but nonetheless chose to commit this crime. Mr. Pollet urges the Court to view this not as a blatant disrespect for the law but rather an indication of how desperate he was to find a connection with someone and the depths of his sexual trauma. Despite knowing that what he was doing was illegal, he still wanted to impress his new "friend" by providing her materials that he knew could land him in this very spot. He sought out those images and videos and with a quick click, distributed them to "her." Mr. Pollet's conduct and cooperation with law enforcement demonstrates that he respects the law and Mr. Pollet's attempted suicide in light of these charges, indicates that these charges will act as a deterrent for him committing similar offenses in the future.

6

## 8. Seriousness of the Offense

Possession and distribution of child pornography is a serious offense. However, the Court should consider the specific facts of this case to determine its seriousness for purposes of imposing an appropriate sentence. There is no indication that Mr. Pollet was trafficking child pornography to anyone other than UCO. The accounts Mr. Pollet used to communicate with UCO were all created shortly before their communication started. Mr. Pollet's Kik account was created on October 7, 2020. His Wicker account was established on September 4, 2020 and his FetLife account was established around September 26, 2020.

The images and videos are disturbing, and Mr. Pollet takes responsibility for his role in perpetuating the child pornography industry and for sharing the videos with someone else. However, Mr. Pollet did not produce them. In fact, many, if not most, of the videos he shared were very old and from other countries. He did not pay for them, and he did not have them available through peer to peer sharing to share with others. He sought them out and sent them to someone else in the context of starting a relationship with that person.

Further, Mr. Pollet was cooperative with law enforcement. The search warrant was served on March 23, 2021. Although the agents had authority to unlock Mr. Pollet's phone with his fingerprint, they failed to ask him to do so. The US Attorney reached out to counsel and Mr. Pollet voluntarily surrendered the password to his phone. A laptop and a thumb drive were seized from Mr. Pollet and there is no indication that they contained any illegal material.

From March 23, 2021, until October 19, 2021, Mr. Pollet was compliant with the prosecution and with pretrial services. On October 19th Mr. Pollet attempted suicide and was briefly hospitalized.

9. **The History and Characteristics of the Defendant**

Mr. Pollet is 48 years old and is before the court on his first criminal offense. Mr. Pollet reports that he suffered childhood sexual trauma at a young age and engaged in violent consensual acts with his partners. He was sexually abused by family members and then by an adult woman when he was a teenager. He has scars on his genitals from the abuse he suffered. He suffered in silence. He began coping by engaging in self destructive sexual behavior, while maintaining employment, supporting his mother and step-father and otherwise maintaining the appearance of "normalcy."

He first disclosed his sexual abuse to his estranged wife, Kacie. When she left him, he spiraled into a dark hole of unhealthy and deviant sexual fantasy. It was the only way he knew how to connect. He sought a relationship with an adult that shared his sexual desires; he played into those fantasies to gain "her" acceptance.

Mr. Pollet attempted to take his own life on October 19, 2021. He realized that his secret was finally out, and he was ashamed. His younger brother is facing similar charges in California and will serve 24 months incarceration. Mr. Pollet has never received counseling for his childhood trauma. A prison term coupled with prolonged, intensive supervised release could adequately protect the public, punish the defendant, and provide him with needed education and mental health treatment.

10. **Prevent Sentencing Disparity**

As discussed in the dissent in *United States v. Walters*, many child pornography cases are sentenced below the guideline range. In fact, 58.5% of all child pornography offenders received a downward variance. Their average sentence reduction was 38.5%. United States Sentencing Commission, Quick Facts: Child Pornography Offenders (fiscal Year 2020) available at

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Child_Pornography_FY20.pdf

The nature of the guideline calculation is based, in part, on redundant facts. For example, the baseline offense level for distribution is 22. Two points are then added for "distribution." Two more points are added for "use of a computer." Further, two points are added for "prepubescent minor" and four points for "infant/toddler." Points are added to the base level offense for activity that constitutes the offense itself. Mr. Pollet is not contesting the calculation of the guideline but rather asks for a variance from the guideline.

Mr. Pollet respectfully requests the Court consider a downward variance from the guideline of 151 months, which has been the general practice in over half of other child pornography cases.

**WHEREFORE**, in light of the foregoing, the Defendant, Jason Pollet, respectfully requests this Court accept the plea agreement, and impose a term less than 94 months of incarceration as a downward variance from the advisory guidelines.

Respectfully submitted,

_/s/ Emily E. Sluk_____
Emily E. Sluk  #0082621
Counsel for Defendant
130 W. Second Street, Suite 1818
Dayton, Ohio 45402
P: (937) 610-7052; F: (937) 226-1224
E-mail: emily@sluklaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was sent by electronic submission via the PACER System to, United States Attorney's Office, 200 W. Second Street, Room 602, Dayton, Ohio 45402 on the date time-stamped hereon.

                                                    */s/ Emily E. Sluk*
                                                    Emily E. Sluk #0082621